UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

——

JEFFREY ALAN MAXON,

               Petitioner,             Case No. 1:07-cv-363

v.                                Honorable Paul L. Maloney

THOMAS BELL,

               Respondent.

_____/

## REPORT AND RECOMMENDATION

      This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. On April 5, 2001, a Lapeer County jury convicted Petitioner of three counts of first-degree criminal sexual conduct (CSC I), MICH. COMP. LAWS § 750.520b, and one count of second-degree criminal sexual conduct (CSC II), MICH. COMP. LAWS § 750.520c(1)(A). Petitioner is serving three terms of 11 years and 3 months to 24 years and one term of 6 to 15 years for the respective convictions, imposed by the Lapeer County Circuit Court on November 30, 2009, on a second remand for resentencing from the Michigan Court of Appeals. In his *pro se* second amended petition, Petitioner raises five grounds for relief, as follows:

      I.      THE PROSECUTOR ENGAGED IN FLAGRANT MISCONDUCT DENYING THE PETITIONER A FAIR TRIAL WHEN IT: (1) INTRODUCED CONSIDERABLE TESTIMONIAL STATEMENTS BY ITS WITNESSES; (2) FAILED TO PRODUCE THE INDEPENDENT FAMILY AGENCY'S STAFF WHO, ALONG WITH TO [SIC] STATE TROOPER PAT NAEL, TOOK THE COMPLAINANT'S TESTIMONIAL STATEMENTS; (3) ELICITED CONSIDERABLE INADMISSIBLE HEARSAY BEFORE THE JURY; (4) ELICITED INADMISSIBLE TESTIMONY OF UNCHARGED PRIOR BAD ACTS ASSERTING TO THE JURY IT WAS [A] PROPER BASIS TO FIND HIM GUILTY;

(5) MISREPRESENTED THE EVIDENCE AND CONTINUOUSLY VOUCHED FOR THE CREDIBILITY OF ITS WITNESSES, ASSERTING TO THE JURY THE DEFENDANT "WAS A LIAR["{;] (6) IMPROPERLY INFORMED THE JURY THAT IF THEY BELIEVED THE COMPLAINANT'S TESTIMONY AND THE EVIDENCE THEY COULD FIND THE DEFENDANT GUILTY BEYOND A REASONABLE DOUBT; AND (7) THE PROSECUTOR'S USE OF DEFENDANT'S POST-ARREST SILENCE AND FAILURE TO INVESTIGATE THE CHARGES OF RAPE AND THE COMPLAINANT'S 1994 BICYCLE ACCIDENT DENIED THE DEFENDANT A FAIR TRIAL AND CONFRONTATION RIGHTS, THEREBY EFFECTIVELY SHIFTING THE BURDEN OF PROOF LEAVING THE DEFENDANT OUT TO PROVE HIS INNOCENCE, U.S. CONST. AM. V, VI, MICH. CONST. ART I, §§ 17, 20.

II. THE TRIAL COURT ABUSED ITS DISCRETION DENYING THE DEFENDANT A FAIR TRIAL BY: (1) ALLOWING THE PROSECUTION TO ELICIT TESTIMONY OF UNCHARGED PRIOR BAD ACTS CONTRARY TO MRE 404(b) OR MRE 608; (2) FAILED TO PROPERLY INSTRUCT THE JURY; (3) ALLOWED THE PROSECUTION TO INTRODUCE INADMISSIBLE TESTIMONIAL STATEMENTS, AND (4) FAILED ITS DUTY TO ENSURE THE DEFENDANT RECEIVED A FAIR TRIAL SHOWING ACTUAL BIAS.

III. THE DEFENDANT'S SENTENCE MUST BE VACATED BECAUSE: (1) THE TRIAL COURT'S REASONS FOR SENTENCING ASSERTING THE DEFENDANT IS A "PREDATOR" TO JUSTIFY ITS DEPARTURE VIOLATED DEFENDANT'S FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; (2) DUE PROCESS COMPELS A JURY'S DETERMINATION OF EVERY FACTOR TO EITHER GUILT OR PUNISHMENT; (3) MICHIGAN'S SENTENCING SCHEME VIOLATES THE U.S. CONSTITUTION AS IT ALLOWS JUDICIAL FACTFINDING; AND (4) IT OPERATES TO ALLOW PUNISHMENT BASED ON FACTOR[S] NEVER SUBMITTED TO A JURY, ADMITTED BY THE DEFENDANT OR PROVEN BEYOND A REASONABLE DOUBT.

IV. THE DEFENDANT WAS CONSTRUCTIVELY DENIED HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL THROUGH DEFENSE ATTORNEY'S: (1) FAILURE TO INVESTIGATE MATTER MITIGATING TO THE CASE; (2) FAILED TO PREPARE A DEFENSE; (3) FAILED TO SEEK EXPERT'S ASSISTANCE; (4) FAILED TO OBJECT TO THE PROSECUTOR'S FLAGRANT MISCONDUCT; (5) FAILED TO OBJECT TO THE TRIAL COURT'S IMPROPER RULINGS, JURY'S INSTRUCTIONS, AND

SENTENCING SCORE; AND FAILED TO BE FAMILIAR WITH THE LAW APPLICABLE TO THE DEFENDANT'S CHARGES.

V.      DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A MEANINGFUL APPEAL THROUGH APPELLATE COUNSEL'S FAILURE TO:   (1) RAISE THE ISSUES THAT RESULTED IN REVERSAL; (2) FAILED TO FOLLOW THE DEFENDANT'S SPECIFIC INSTRUCTIONS WITH RESPECT TO HIS APPEAL; (3) FAILED TO INVESTIGATE THE COMPLAINANT'S BICYCLE 1994 ACCIDENT; AND (4) FAILED TO MAINTAIN REASONABLE COMMUNICATION WITH THE DEFENDANT AND PROVIDE THE DEFENDANT WITH INFORMATION RELATED TO HIS APPEAL IN A TIMELY OR REASONABLE MANNER.

Respondent has filed an answer to the second amended petition (docket #49) stating that the grounds should be denied because they are either procedurally defaulted or without merit. Upon review and applying the AEDPA standards, I find that all grounds are without merit. Accordingly, I recommend that the petition be denied.

## Procedural History

### A.      Trial Court Proceedings

The state prosecution arose from the complaint of Petitioner's then-13-year-old step-daughter that Petitioner had repeatedly sexually assaulted her over the course of a year. Petitioner initially was charged with one count of CSC I, but, on the basis of the proofs introduced at a preliminary examination held December 1, 2000, he was bound over on amended charges of three counts of CSC I and one count of CSC II. Petitioner was tried before a jury beginning on April 3, 2000, and concluding on April 5, 2000.

The victim, Kelly Elizabeth Howell, testified that she was 13 years old. Her sister, Amy Howell, was 22. Her mother, Pamela Maxon, married Petitioner Jeff Maxon in 1994, when Kelly was 7. (Tr. II, 204.) All four lived together in the same house from 1994 until 2000. (Tr. II,

206.) Kelly testified that, when her mother first married, she had a good relationship with Petitioner, who treated her like a daughter. (Tr. II, 207.) Kelly stated that she would fight Petitioner about doing things, like mowing the lawn, but they did not yell or scream at each other. (Tr. II, 208.) In early June of 1999, the relationship changed. (Tr. II, 209) Sometime between when school got out and her birthday on June 13, Kelly was reading on her bed, lying on her stomach with her head facing the window. (Tr. II, 210-11.) Petitioner came into the room, rubbed his hand on her butt and "sort of smiled" at her. (Tr. II, 211.) She got scared and ran downstairs and outside. (Tr. II, 211.) Petitioner had never touched her in a similar way before. They would just hug and kiss goodnight. (Tr. II, 211-12.) From that time on, she felt like Petitioner was different and meaner, and she did not like him. (Tr. II, 212-13.) After the first occasion, Petitioner began doing other things to Kelly. He would tell her to take off her shirt or pants. (Tr. II, 213.) She at first refused, but when she saw the look on his face, she got scared. (Tr. II, 214.) One time, Petitioner told her that if she told anyone, she would end up like the Ramsey girl. (Tr. II, 214-15.) She understood that to mean that, if she told anyone, she would die. (Tr. II, 215.) Sometimes after she had taken off her shirt and pants, Petitioner would just look at her or touch her breasts or butt. (Tr. II, 215.) Sometimes, he would put his fingers in her vaginal area. (Tr. II, 215.) At the end of each contact, Petitioner told Kelly to go take a shower. (Tr. II, 215.) Later on, he would force her to take off all her clothes, go upstairs on her parents' bed, and have sex with him. (Tr. II, 216.) The events typically occurred between 3:10 p.m., when she got home from school, and 3:30 p.m., when Petitioner left for work. (Tr. II, 216.) When she arrived home at 3:10, Petitioner usually would be taking a shower. She would let the dog out and then Petitioner would come down the stairs and tell her to go upstairs. She

would go to her parents' room, and he would force her to have sex. According to Kelly, this happened two to three times per week. (Tr. II, 217-18.)

On June 13, 2000, Kelly's thirteenth birthday, Petitioner volunteered to take her to school early in the morning for a trip to Cedar Point with her school band. (Tr. II, 219.) She had planned to get up at 4:00 a.m. to get ready to go. Petitioner woke her early, at 3:30 a.m., after he arrived home from work. (Tr. II, 220.) He told her to go downstairs and then forced her to the kitchen floor. (Tr. II, 221.) He then had sex with her in the dark kitchen. (Tr. II, 222.) Petitioner put his hand over her mouth, because she was trying to make noise. (Tr. II, 223.) He kept telling her to shut up. After he was finished, he told her to go upstairs to take a shower. (Tr. II, 223-24.) Kelly testified that she did not know if Petitioner had an orgasm. (Tr. II, 223.) She remembered that occasion because it was her thirteenth birthday. (Tr. II, 224, 228.)

Kelly testified that she remembered the timing of another occasion. On August 21, 2000, Petitioner came downstairs in the afternoon. He told her to go upstairs, where he forced her to have sex with him on her parents' bed. First, he made her remove her clothes. (Tr. II, 224-25.) She cried and tried to hesitate. Petitioner removed the towel he was wearing and sexually assaulted her while she was on her back with her feet hanging off the bed. (Tr. II, 226.) Kelly closed her eyes and covered her face with her hands. (Tr. II, 227.) She did not know if he had an orgasm or used a condom on that occasion. (Tr. II, 227.) Petitioner never kissed her during the assaults. (Tr. II, 227.) Kelly remembered the date because it was the last day of summer vacation. (Tr. II, 228.)

She remembered a third specific incident that occurred sometime between June 13 and August 21. (Tr. II, 228.) At that time, Petitioner forced her to go to his room, take off her clothes, and get on her hands and knees in the middle of the bed. (Tr. II, 228-29.) Petitioner

sexually penetrated her anus, and she experienced pain. (Tr. II, 229.) Later, he called her from his cell phone while he was driving to work to ask if she had any bleeding. She denied bleeding because she did not want him to come home. However, she did experience bleeding. (Tr. II, 230.)

Each of the three charged incidents of assault occurred while she was on summer vacation. (Tr. II, 230-31.) When she was not in school, Kelly got up with her mother at about 6:00 a.m. Her mother and her sister Amy would leave for work at about 8:00 or 8:30 a.m. (Tr. II, 231.) Petitioner would not get up until between 10:00 a.m. and noon. (Tr. II, 231.) When Petitioner woke up, he would eat breakfast and then they would do their chores. (Tr. II, 232.) Petitioner was nice to her while doing the chores, but she hated being around him. (Tr. II, 232-33.) At about 2:00 p.m., she typically would cook Petitioner's dinner, and he would eat at about 2:30 p.m. He then would get a shower, after which he would come downstairs dressed in a towel and tell Kelly to go upstairs to her mom's room. He would then force her to have sex with him. (Tr. II, 233.) Normally, Petitioner assaulted her at this time of day. The exception to that rule was the time it happened on the morning of her birthday, June 13. (Tr. II, 234.) Petitioner had awakened her in the early morning hours on other occasions, but she had refused to go downstairs with him. (Tr. II, 234.) She tried to avoid having to face him at 3:00 a.m. by sleeping on the floor in her sister's room (Tr. II, 235.) If her sister asked why she was there, Kelly claimed to have had a bad nightmare. (Tr. II, 235.)

Kelly identified one of her journals. (Tr. II, 235.) She got the journal for Christmas in 2000, after the sexual assaults had begun. (Tr. II, 235.) The journal had no writing in it except her name, although she had written in it at one time. (Tr. II, 236-37.) She had written that she hated

Petitioner, and she described that he was touching her. In the summer, before her June 13 birthday, Petitioner asked her if she had written anything in her journal. (Tr. II, 237, 239.) She denied it, but he insisted on looking at it. (Tr. II, 237.) When she told him that she did not have the key, he ripped the journal open. (Tr. II, 237.) Petitioner read what she had written and then ripped out the page. He then burned the page in the fireplace. (Tr. II, 238.) After ripping out the page, he told her not to write anything down again. (Tr. II, 238.)

Kelly identified another journal as one her sister had been given but had not used. Kelly wrote her name in it and recorded her feelings in the summer of 2000, before the August 21st incident. The first page starts, "Dear Journal: I'm so confused about everything. I get to the point where I'm so scared to death. Jeff hates me. I know it. Why else would he be making my life such hell." (Tr. II, 241.) Kelly identified a third journal, with an entry dated June 29, 1999, stating: "I turned 12 June 13th. Summer sucks so far. I hate Jeff so much. He always tries to touch me. I can't tell. Promise." (Tr. II, 243.) Kelly explained that the touching she referred to was of her breasts and vaginal area. (Tr. II, 244.)

On September 12, 2000, the day she finally disclosed what had been happening, Petitioner woke her at about 3:30 a.m. and told her to go downstairs. (Tr. II, 246, 251.) When she refused, he ordered her to be there in five minutes. When she did not appear, he came back and again ordered her to be downstairs within five minutes. (Tr. II, 246.) She quietly ran into her sister's room and laid on the floor. Petitioner came into her sister's room and said, "What are you doing? Get downstairs." Kelly was surprised, thinking her sister was in her bed. When she got up, however, she saw that her sister was not there. (Tr. II, 246.) When she reached the bottom of the stairs where he was waiting, she said, "[D]on't touch me or I'll scream." (Tr. II, 246.) She walked

to the kitchen and sat on the step between the kitchen and living room. (Tr. II, 247.) She said, "Please don't make me do anything," and she started to cry, putting her head in her hands. (Tr. II, 247.) He told her that they were not going to do anything, and he said that she was just sad because her sister was moving out. (Tr. II, 248, 258.) She told him that she "hated him and [she] didn't like what was going on and [she] wanted it to stop and then [her] sister walked in." (Tr. II, 248.) Her sister walked in and asked what was going on. Amy began to talk with Petitioner, and Kelly went upstairs to her room. (Tr. II, 249.) A couple of minutes later, her sister got into bed with her. (Tr. II, 249.) Kelly was scared and upset and was shaking and crying. (Tr. II, 249.) Kelly and Amy began to talk. (Tr. II, 249.) Petitioner then came up and opened Kelly's door. When he saw Amy, he sort of jumped back and then said that he let the dog out. (Tr. II, 250.) Ten minutes later, Petitioner came back to say that he had let the dog back in. Then Petitioner went to bed, and the girls could hear his breathing machine turn on. (Tr. II, 250.) Amy had her arms around Kelly, and Kelly faced the wall. (Tr. II, 250.) Kelly told Amy that Petitioner had been touching her. (Tr. II, 250-51.) Kelly did not fall back asleep, and got up at 4:30 a.m. to get ready for school. (Tr. 251.) Her sister stayed with her in the bathroom to make her feel safer. (Tr. II, 252.) Kelly was worried that, because she had told Amy, Petitioner would try to hurt Amy. (Tr. II, 252.) After her shower, Kelly got dressed, and the two girls went downstairs and sat on the family room couch and turned on the television. Her mother came downstairs and then drove Kelly to her bus stop. Amy accompanied them, which was highly unusual. (Tr. II, 253.) Amy and Kelly had not discussed how they were going to handle the situation. Amy had just told her that everything was going to be alright. (Tr. II, 254.) Kelly was upset that her sister was going to be moving out, because her sister was her protection, in that she could run to her sister's room and go places with her at night. (Tr.

II, 254.)  Kelly testified that she did not tell her sister before what was going on because she was threatened.  (Tr. II, 255.)  After she had been dropped-off at the bus stop, she saw her mother's car stop at the top of the hill for a bit, and then her mother stepped on the gas and they flew down the hill.  (Tr. II, 255-56.)  During her first-hour class, a woman from the office came to get her because someone was there for her.  (Tr. II, 256.)  Kelly was afraid, thinking it was Petitioner.  When she saw her mother and sister, she ran up to her mother and gave her a hug.  (Tr. II, 257.)  They drove to a church parking lot and began to talk.  (Tr. II, 257.)  Kelly described for her mother what had been going on with Petitioner.  (Tr. II, 257.)  She stayed with her mother and sister for the rest of the day.  (Tr. II, 258.)  They knew that they needed to get out of the house.  They drove to the apartment complex that Amy was moving into and switched the lease to a two-bedroom apartment instead of a one-bedroom apartment.  (Tr. II, 260.)

Kelly spoke with Trooper Nael the day after she told her mother  (Tr. II, 259-60.) When she spoke with Trooper Nael, he was accompanied by two women from child protective services.  (Tr. II, 260.)  Kelly explained to Trooper Nael what had happened with Petitioner.  (Tr. II, 260.)  She gave Nael some dates, but it was hard because it was the first time she had tried to remember dates.  (Tr. II, 261.)  If the dates are different in Nael's report, it would be because she was confused, with three people asking her questions at the same time.  (Tr. II, 261.)  Nael advised Kelly to get a medical examination.  (Tr. II, 259.)  She was examined by Dr. Carter, but she never discussed the results of the exam with him.  (Tr. II, 261.)  Kelly acknowledged that she knew what a vibrator was, though she denied having one or knowing that her sister had one.  (Tr. II, 262, 288.) Kelly denied having a boyfriend and denied having sex with anyone other than Petitioner.  She testified that she had kissed a boy only once, during a birthday party in sixth grade when they played

spin the bottle.  (Tr. II, 263.)  She also denied being angry with Petitioner that Amy was moving out

of the house.  She hated Petitioner for the things he made her do with him, not for any conflict he

may have had with Amy about her boyfriend.  (Tr. II, 264.)  She also clarified that the incidents she

specifically described were not the only incidents of sex with Petitioner.  He regularly assaulted her

two to three times per week.  The last time was August 21, 2000.  (Tr. II, 265.)  When she was in

seventh grade, Kelly told her best friend about what was happening.  (Tr. II, 267.)  They were

talking, and Kelly began to cry.  Jenny asked what was wrong, and Kelly told her that Petitioner was

touching her and forcing her to have sex with him.  (Tr. II, 267.)  She told Jenny, "[Y]ou gotta

promise me you can't tell."  (Tr. II, 268.)  Jenny never told, as far as Kelly knew.  (Tr. II, 268.)

 In 2000, Petitioner got Kelly tickets to see the Backstreet Boys, her favorite group.

(Tr. II, 235, 269.)  Petitioner said, "Since I got you your ticket, you owe me."  When she asked how,

Petitioner said, "You know how." (Tr. II, 269.)  She understood that she would have to have sex

with Petitioner.  She asked if she could just mow the lawn for two months instead.  The offer was

not acceptable to Petitioner.  (Tr. II, 269.)  Kelly testified that she used tampons, but she did not

begin to do so until the summer of 2000, after the sexual assaults had been going on for months.  (Tr.

II, 301.)

 Amy Howell, Kelly Howell's sister, was 22 years old at the time of her testimony.

She testified that she had a normal stepfather/stepdaughter relationship with Petitioner, whom she

had known since 1994, when he married her mother.  (Tr. II, 329.)  When she first met Petitioner,

Amy was living with her natural father in Grand Rapids.  (Tr. II, 330.)  Two months later, she moved

in with her mother, Kelly and Petitioner, when they moved to Columbiaville.  (Tr. II, 330.)  In

November 1999, they all moved to 330 Leon Lane.  (Tr. II, 331.)  In May of 1999, she began

working for a doctor in Lapeer. Her hours were 9:00 a.m. to 5:00 p.m., but she usually arrived home between 8:00 p.m. and midnight, depending on her school hours and other plans. (Tr. II, 331-32.) In August of 2000, Amy got a promotion. With the extra pay, she decided to get an apartment. (Tr. II, 333.) The family had talked about it, as she was 21 years old. Petitioner could not wait until Amy was out of the house. Her mother and Petitioner said they would give her the $300 deposit. (Tr. II, 333.) Amy testified that she had been seeing Thiante (or Thio) Calaway for nine or ten months. (Tr. II, 334.) According to Amy, Petitioner did not really approve of Thiante, but they seemed to get along alright. (Tr. II, 335.) Amy got approved for the one-bedroom apartment at the end of August and was planning to move in the second week of September. (Tr. II, 336.) On September 11, 2000, she worked all day and then came home and packed. Petitioner had gotten her boxes and pulled the truck out so she could load it. Kelly did not help at all and seemed angry with Amy. (Tr. II, 337.) Amy was up late packing and then she laid down on the couch in the computer room. She saw Petitioner drive into the yard and heard him come into the house. (Tr. II, 339-40.) She heard Petitioner go upstairs and then heard Kelly's door screech as Petitioner let the dog out. (Tr. II, 340.) The dog came down, followed by Petitioner. Petitioner was wandering around downstairs, and then Amy heard him go upstairs again. She assumed he was going to bed. (Tr. II, 341.) She heard Kelly's door again and then heard Petitioner come back down the stairs. About five minutes later, she heard someone else come down the stairs. From where she was lying, she could see that it was her sister Kelly. (Tr. II, 341.) Amy laid there and listened. Neither the TV nor the kitchen light was on. Then she heard voices, and, from the sound of it, something wasn't right. After about three minutes, she got up and went down the hall, approaching them from the back as they sat on the step into the kitchen. At this point it was about 4:00 a.m. (Tr. II, 342.) Her sister

was crying and Petitioner was sitting about a foot and a half away. (Tr. II, 343.) Amy asked what was going on, and Petitioner jumped up, saying they were waiting for the dog to come in. (Tr. II, 343.) When Amy asked Kelly what was the matter, Petitioner responded that Kelly was upset because Amy was moving out. When Amy asked Kelly again, Kelly said, "I have a bad headache," and ran up the stairs. (Tr. II, 343.) Then Petitioner began talking "a mile a minute" saying, "She's upset because you're moving out and I was trying to talk to her about it." (Tr. II, 343.) He went on to tell Amy that he had pulled the truck in for her, that he had cleaned it out, and that he was going to take a load over, and he asked when she needed the keys. Amy testified that she knew that something was not right by his behavior. (Tr. II, 343.) She watched Petitioner and then told him, "I'm going to bed. It's late." She then went upstairs and opened Kelly's door, asking if she could sleep with Kelly. Kelly did not answer, but Amy could hear her crying, so she got into bed with her. When Amy laid down, Kelly was shaking and trembling so hard that it scared Amy. (Tr. II, 344.) She asked Kelly what was the matter. Kelly did not immediately respond. At this point, the prosecutor sought to admit Kelly's statements based on the excited utterance theory. (Tr. II, 345.) Defense counsel objected on the grounds that it was hearsay. (Tr. II, 346.) The court allowed the testimony under the excited utterance exception. (Tr. II, 346.) When Kelly refused to anser her, Amy grabbed her and asked again. Kelly said, "I can't tell you." (Tr. II, 347.) Amy responded, "You can tell me anything. Tell me now." (Tr. II, 347.) Kelly whispered in Amy's ear, "Not when he's awake." (Tr. II, 347.) Amy testified that, at that point, she knew something was wrong. (Tr. II, 347.) As they laid there, Petitioner came up the stairs and opened Kelly's bedroom door. He was startled to see Amy there and then told the girls that he just wanted to tell them that the dog was not in yet. (Tr. II, 348.) Petitioner went back downstairs. (Tr. II, 348.) Amy again asked Kelly what

had happened.  Kelly started crying and said, "He told me if I told anybody I'd end up like the Ramsey girl."  (Tr. II, 348.  Amy said, "What? . . . Is he hurting you?"  (Tr. II, 348.)  Kelly started crying and shook her head yes, saying, "For a long time."  (Tr. II, 348.)  Amy asked if Petitioner had touched Kelly, and Kelly said yes.  Amy just laid there and held Kelly and told her, "He'll never touch you again."  (Tr. II, 348.)

Petitioner came back upstairs, and Amy testified that she was scared to death because they had guns in the house, and Kelly was so scared that she was clawing Amy.  They both laid there and shook.  (Tr. II, 348.)  Amy told Kelly to turn toward the window so that Petitioner did not think they were talking.  Amy pretended that she was sleeping.  Petitioner again opened the door and told them that the dog was in.  They heard his breathing mask begin to run, so they knew that he had gone to bed.  (Tr. II, 349.)  After that, Kelly told Amy a bit more and repeated what Petitioner had said about the Ramsey girl.  She was also afraid that her mother would hate her because they would be poor.  (Tr. II, 349.)  By this time it was 4:30 a.m., and Kelly ordinarily got up for school at 5:00 a.m.  Amy told Kelly that she should go to school as normal, but they did not discuss a plan.  (Tr. II, 349.)  Amy just told Kelly that she would protect her and that she was going to school.  Amy planned to talk to their mother.  (Tr. II, 350.)  Amy was numb that morning.  She followed Kelly around while she got ready for school.  (Tr. II, 350.)  When her mother and Kelly got into the truck to go to the bus stop, Amy jumped in the back seat.  She explained to her mother that, "It's my last days living here.  I just want to ride down with you guys . . . ."  (Tr. II, 351.)  As she hugged Kelly goodbye, she told her she loved her and whispered, "It will be okay."  (Tr. II, 351.)

After they dropped Kelly and turned around, Amy's mother asked her what was wrong because she was pale as a ghost and had been throwing up all morning.  She said, "I need to

tell you something. . . . Pull over. I have to tell you something." Her mother looked at Amy and said, "Oh my god. You're pregnant . . . ." (Tr. II, 352.) Amy said no, and told her mother, "Jeff has molested Kelly." (Tr. II, 352.) Her mother became very upset, opened her truck door and threw up. She was shaking and confused. Then, the two struggled for about ten minutes because her mother wanted to kill Petitioner. Amy begged her mother, saying, "We need you. I can't raise Kelly on my own." (Tr. II, 353.) Her mother finally calmed a bit, and they began to plan. They decided they needed to first get Kelly, but they wanted things to appear as normal as possible at home because there were guns there. They took their showers, got ready for work, and left the house. Amy left in her own car and parked it at the grocery store up the street. She then rode with her mother to Kelly's school to pick her up. When Kelly came out of her classroom and saw them, a huge look of relief came over her face. (Tr. II, 354.) After collecting Kelly's things, they drove to a church parking lot and discussed the situation. They decided that Kelly could not return to the house, so they went to the bank to get some money. (Tr. II, 355-56.) They then drove to Amy's apartment complex and made arrangements to change her planned rental from a one-bedroom unit to a two-bedroom unit. (Tr. II, 356-57.) Amy's mother then needed to go to work because Petitioner regularly called her there at lunchtime. (Tr. II, 357.) They returned home after Petitioner left for work. (Tr. II, 358.) They loaded everything they could into Amy's mother's truck and Petitioner's truck, and they made several trips back and forth to the rental unit. (Tr. II, 359.)

Amy testified that Kelly slept in her bedroom on a number of occasions. Amy would wake up and find Kelly there, and Kelly would tell Amy different reasons why she was there, such as she had a bad dream or there were mosquitos in her room. (Tr. II, 359.) Amy acknowledged possessing a vibrator that was given to her as a gag gift when she turned 18. She stated, however,

that it was buried in a box in her closet and had never been unpacked since she moved into the home. She had never told Kelly or anyone else about the vibrator.  (Tr. II, 360.)

Dr. Norman Carter testified that he was a pediatrician and the Medical Director for the Child Evaluation Clinic at McLaren Regional Center in Flint, which specializes in medical examinations of children in cases of alleged child abuse.  He personally had conducted approximately 650 such examinations.  (Tr. II, 375-77.)  Carter was qualified as an expert in pediatric care and examination.  (Tr. II, 378.)  Carter testified that he examined Kelly Howell on November 8, 2000.  (Tr. II, 380.)  He found that her hymen had a circumferential disruption with hymenal tags.  (Tr. II, 382-83.)  The finding was consistent with repeated vaginal penetration.  (Tr. II, 384.)  He indicated that he could not tell whether the disruption was caused by a penis or a finger, but it would not be expected with the use of a tampon.  (Tr. II, 385.)  According to Carter, the disruption around the opening was only consistent with masturbation if the girl was using something with which to masturbate in a way in which he would have expected to be painful.  (Tr. II, 385.)  It would be unusual to see such an injury caused by masturbation unless the child was mentally retarded.  (Tr. II, 388.)  It also was a disruption that would be unlikely to have occurred with a single incident.  (Tr. II, 386.)  Carter found no anal abnormalities.  However, unless the anal penetration caused significant, as opposed to moderate, fissuring or tearing, he would not have expected to see evidence of the injury three months later.  (Tr. II, 386-87.)  Carter testified that in 90 percent of the cases taken by the clinic, they find no evidence of sexual abuse.  (Tr. II, 393.)

Pamela Ann Maxon, Kelly's mother, testified that Petitioner was her husband.  (Tr. II, 399.)  On September 12, 2000, Pamela woke up at 6:30 a.m.  She went downstairs and found Amy and Kelly sitting on the couch, which was unusual.  At 6:45, Pamela and Kelly went to the

truck to drive Kelly to the bus stop. She turned around to find Amy behind her, saying, "I'm going with you." (Tr. II, 409.) She was surprised and a bit annoyed because it was unusual. (Tr. II, 409.) After dropping-off Kelly and watching her get on the bus, Pamela turned around and drove to the first rise, when Amy told her to stop. (Tr. II, 410.) Amy told Pamela that she had something to tell her. Seeing the horrible look on Amy's face, Pamela said, "Oh, my god, you're pregnant!" (Tr. II, 412.) Amy responded, "No, . . . [i]t's bad, mom." (Tr. II, 412.) Amy then told her, and she went numb. After Amy repeated her story, Pamela slammed her foot on the gas pedal and flew down Johnson Drive. (Tr. II, 412.) Pamela said, "I'm going to kill the motherfucker." (Tr. II, 413.) She stopped and started several times in the driveway and then sat in the vehicle for about 40 minutes, crying and screaming. (Tr. II, 413.) Pamela went into the house, deciding that her daughter would never live in the house again until she got to the bottom of the matter. She took a shower and got dressed for work, and Amy did the same. Then they drove to the school, telling the office that Pamela needed to take her daughter out of school that day. (Tr. II, 413.) After picking up Kelly, they drove a couple of miles to a church parking lot and talked, and she held and comforted Kelly. They then drove to the apartment complex where Amy had just signed a rental agreement, and they switched the lease from a one-bedroom to a two-bedroom unit. She then went to the bank and got $400.00 and returned. They signed the lease and got the keys. (Tr. II, 414.) Pamela remembered that her husband would expect to talk to her at work at lunchtime. She went to work and told her office manager what had happened and then went to her office for awhile. She spoke with her husband without indicating that anything was wrong. After Petitioner left for work at 3:30 or 3:40 p.m., the three went to the house and began packing, making several trips back and forth to the apartment. Pamela made a point of being at home at 7:00 p.m., because her husband would expect

to find her there when he called at his break. (Tr. II, 416.) She again spoke with Petitioner, but she did not reveal what was going on. (Tr. II, 416.) When they left the house the last time, she left a note for Petitioner, saying, "I know what you did to my daughter . . . . You might as well go ahead and blow your head off now." (Tr. II, 417.) She then took the topping from their wedding cake, slammed a butcher knife down the middle of it, and left it sitting on the counter. (Tr. II, 417.) Pamela had a cell phone, but she did not hear from her husband that night. (Tr. II, 418.) A couple of days later, the phone was reported stolen by someone, but that person was not Pamela. (Tr. II, 418.) At the same time, her name was taken off the joint credit card and the money was removed from their joint checking account. (Tr. II, 421.)

The day after they moved, Pamela called the police. (Tr. II, 422.) She was advised by the police to get Kelly a physical examination. (Tr. II, 423.) They told her about a doctor in Flint who was an expert in this type of case and advised her to wait to see him. She did not want to wait, and she made and cancelled appointments with other physicians, based on conversations with Trooper Nael. Either Nael or Child Protective Services made an appointment for Kelly with the Flint physician, but the appointment was set for November 8. Pamela had no choice but to wait for that date, and she was frustrated. (Tr. II, 423.) Pamela got Kelly into counseling, with which she continued at the time of trial. (Tr. II, 424.) She testified that Kelly's grades had dropped by a grade point in seventh grade from where they were in sixth grade. (Tr. II, 427.) Pamela testified that, based on their demeanors, she never doubted her daughters were telling the truth. (Tr. II, 445.)

Michigan State Police Trooper Pat Nael testified that he had been a trooper for 23 years and that he had specialized training in forensic interviewing of children involved in assaults. (Tr. II, 451.) Over the years, he had been involved in 400 or 500 investigations of alleged criminal

sexual assault. (Tr. II, 452.) Nael was contacted by Pamela Maxon about an alleged assault on her daughter. (Tr. II, 452-53.) When Nael initially spoke with Pamela and Kelly on September 13, Kelly was too upset to talk, and Nael determined that he needed to make contact with the Family Independence Agency (FIA). After only a couple of minutes, he concluded that continuing the interview would not be appropriate, and he scheduled another time for an interview a couple of days later. (Tr. II, 454.) On September 15, accompanied by two representatives from FIA, he interviewed Kelly at her apartment. (Tr. II, 454-55.) Nael obtained a statement from Kelly. He did not try to pinpoint dates, because interviewing techniques require the victim to generate the information. (Tr. II, 456.) Kelly was very upset at the time of the interview. (Tr. II, 459.) The situation was not ideal, with the FIA representatives also interviewing Kelly, but the joint interview was done in order to minimize the number of times Kelly would have to tell her story. (Tr. II, 457.) Later in the investigation, Pamela Maxon called Nael to tell him that Kelly had told her of an incident of anal intercourse. (Tr. II, 460.) Nael advised her to talk to the prosecutor about the incident rather than setting another interview with the police. (Tr. II, 461.) Nael stated that he had advised Pamela Maxon not to take Kelly to another doctor, but to wait and have the examination done by Dr. Carter's office at McLaren Medical Center in Flint. He knew from experience that Dr. Carter's staff was expert in this kind of examination and had more knowledge of the subject than a family doctor would. (Tr. II, 462.) The appointment was scheduled by the FIA shortly after the September 15 interview. (Tr. II, 463.)

Nael contacted Petitioner on Monday, September 18, 2000. (Tr. II, 463.) Nael told Petitioner that he wanted to talk to him about a complaint that had been made against him, and Petitioner said that he would come to the police post at 1:00 p.m., but Petitioner did not show up.

(Tr. II, 464.)  Defense counsel objected to the line of questioning, saying that Petitioner had a Fifth Amendment right not to incriminate himself and he had no legal duty to talk to the officer.  (Tr. II, 464.)  The prosecutor agreed, arguing only that he had the right to establish that the officer had attempted to make a complete investigation.  (Tr. II, 465.)  No further questions were asked about Petitioner's failure to make a statement.  The prosecution rested its case.  (Tr. II, 473.)

Petitioner moved for a directed verdict of acquittal, regarding the CSC II charge, arguing that no evidence had been introduced that would establish that the touching was done with a sexual purpose or for sexual gratification.  (Tr. II, 474.)  The court denied the motion.  (Tr. II, 479.)

Petitioner testified that he had lived at the Leon Lane address since November 1997 with his wife, two stepdaughters and, sometimes, his son.  (Tr. III, 482.)  He worked at the GM Orion plant in Lake Orion, which is forty miles from the house in Columbiaville.  (Tr. III, 483.)  For the last two years, he had worked second shift, which is scheduled from 5:00 p.m. to 2:30 a.m.  (Tr. III, 484.)  He left for work everyday at 3:30 p.m.  He arrived home between 3:30 and 5:00 a.m., depending on how late he may have to work beyond the eight hours.  (Tr. III, 484.)  Pam and Amy worked the day shift, from 9:00 a.m. to 5:00 p.m.  (Tr. III, 485.)  Pam ordinarily drove Kelly to the bus stop shortly after Pam got up at 6:30 a.m.  (Tr. III, 486.)  Kelly would arrive home at 3:15 or 3:20 p.m., if she did not have an after-school activity, but Petitioner testified that Kelly had many after-school activities.  (Tr. III, 486, 489.)  Petitioner worked 10 to 16 hours a day, taking overtime, until 2000, when they were limited to 10-hour-days.  (Tr. III, 493.)  During the first four years of his marriage, Petitioner had only minor problems with Pam's daughters.  (Tr. III, 494.)  That changed in the summer of 2000, when Kelly became more defiant.  (Tr. III, 497.)  The situation with

Amy was different, as both he and she would walk off instead of arguing. (Tr. III, 499.) He did not approve of Amy's boyfriend Thiante. (Tr. III, 499.) According to Petitioner, both Amy and Kelly were manipulative; they were friendly to him in front of their mother, but they ignored him at other times. (Tr. III, 501.) Petitioner testified about getting Backstreet Boys tickets for Kelly, and he acknowledged that he probably said that she owed him for it, but he was referring to her doing her chores without argument. (Tr. III, 503-04.) According to Petitioner, Kelly was mad because she wanted to go on vacation with them. (Tr. III, 506, 508.)

On Tuesday, September 12, 2000, Petitioner got home from work at 4:15 or 4:30 a.m. following a ten-hour shift. (Tr. III, 508.) He pulled his motorcycle into the garage, took his leather off, and went upstairs. There, he put his pajamas on and started back downstairs. The dog was in Kelly's room and was whimpering. He opened Kelly's door to let the dog out and then let it outside. (Tr. III, 509.) Then Kelly came downstairs, upset because her sister was moving out. (Tr. III, 510.) Petitioner turned because the dog had jumped up on the door, and Kelly ran back upstairs. (Tr. III, 510.) Petitioner went upstairs and saw Kelly's door open and assumed she was sleeping in Amy's room, as she had been doing for the last week since Amy announced she was moving out. (Tr. III, 510-11.) Petitioner went into Amy's room and told Kelly to come back downstairs because they needed to talk about it. (Tr. III, 512.) Petitioner went downstairs, and a couple of minutes later, Kelly came down and sat on the step between the kitchen and the family room. (Tr. III, 513.) He told Kelly that it was time for Amy to leave and be on her own. Kelly said that she didn't want Amy to move. Then Amy came in and asked, "What the hell is going on?" (Tr. III, 514.) Kelly turned and told her that she had come down to get some Tylenol because she had a headache. (Tr. III, 514.) Petitioner looked strangely at Kelly because he did not know where her statement had come from.

(Tr. III, 515.)  Petitioner told Amy that Kelly was upset because Amy was moving out.  (Tr. III, 515.)  Then the dog jumped up on the door and he got up to let it in.  He turned around, and Amy and Kelly were heading up the hallway with their arms wrapped around each other.  (Tr. III, 515.)  He waited another ten or fifteen minutes, because the dog had run off again.  (Tr. III, 515.)  By now, it was 5:00 a.m., around the time Kelly gets up.  He knocked on Kelly's door and told her the dog was still outside and to remember to let the dog in when she got up.  (Tr. III, 516.)  Petitioner went into his bedroom and laid down.  He no sooner did so than he heard the dog barking, and he got up again to let the dog in.  (Tr. III, 516.)  He then opened Kelly's door and told her not to worry about the dog because it was in.  (Tr. III, 516.)  Petitioner went to bed.  (Tr. III, 516.)  He got up at about 11:00 a.m., and he called his wife at work at about noon.  She seemed short with him and told him that she had a seminar to attend in Flint and that she had to leave at 2:30 p.m. and would pick Kelly up after basketball practice at 6:30.  (Tr. III, 517.)  Petitioner then fixed something to eat, washed his motorcycle, and went to work.  (Tr. III, 518.)  He talked to his wife at about 7:45 that evening, when he called her during his break.  (Tr. III, 519.)  His wife told him that they had the truck loaded and were taking a load over to Amy's apartment and would be back at 9:30 p.m.  She told him she would see him in the morning.  (Tr. III, 519.)  Petitioner got into an argument with his boss and was given the rest of his shift and two more days off.  On the morning of September 13, he left the shop at 1:30 a.m. and got home at 2:40 a.m.  (Tr. III, 520.)  When he arrived, every light in the house was on, the truck was there, but Pam's Tahoe was gone.  (Tr. III, 520.)  The door was open from the garage to the house.  He walked in and saw the furniture was gone and only his clothes and the bed were left in his bedroom.  (Tr. III, 522.)  Petitioner went back downstairs and saw the top of the wedding cake with the butcher knife in it.  There was a note on the cardboard in red crayon saying,

"You messed up my life. . . . We know what you done with Kelly. You fucking pervert. Why don't you blow your head off." (Tr. III, 522.) Petitioner testified that he did not know what to think. He sat in his chair beside the phone for two days, waiting for his wife to call. (Tr. III, 522.) On Wednesday night at 11:13, the Lapeer County Sheriff came and served him with a Personal Protection Order (PPO). (Tr. III, 523.) Petitioner attempted to call his wife several times on her cell phone and tried to call her at work, but they would tell him she was not there. (Tr. III, 524.) He did not know what was going on. (Tr. III, 524.) He finally talked to Pam two weeks later. (Tr. III, 524-25.) He pulled up next to her while she was in her car at work and asked her to go with him to talk in the Meijer parking lot. (Tr. III, 526.) She told him he should not be there because of the PPO, and he said he knew that, but he needed to talk to her. (Tr. III, 526.) She talked to him for 15 minutes, but she was in a hurry to leave. (Tr. III, 526.) He knew by then what the charges were, because he had contacted a lawyer and asked him to call the state police. The lawyer informed him of what the accusations were. (Tr. III, 526.) She met with Pam again on Wednesday, and they spoke for 50 or 55 minutes. He asked if she had taken Kelly to the doctor. (Tr. III, 527.) He told her that if she would have taken Kelly to the doctor, she would never have moved out. (Tr. III, 527.)

Petitioner denied touching Kelly's butt in June 1999. He remembers the day. He had asked Kelly a half dozen times to help him cut grass. When he went upstairs, she was lying in her bed and reading a book with her feet in the air. He slapped her on the ankle and told her it was time to cut grass. She told him that she was going to live with her dad because she did not have to work there. (Tr. III, 530.) He never touched her butt. (Tr. III, 530.) He also denied ever having sex with Kelly. (Tr. III, 531, 532, 533.) He frequently called Kelly from his cell phone while on his way to

work to remind her to do her chores. (Tr. III, 531.) He denied tearing any piece of paper out of Kelly's diary or reading her diary. (Tr. III, 532.) He believed that Kelly made the allegations against him because she blamed him for Amy moving out. Petitioner continually made comments about Amy leaving because she would do nothing around the house. (Tr. III, 533.) Petitioner acknowledged that he cancelled his wife's cell phone, moved the money from the checking account into another account and cancelled the credit cards. He stated that he did not cancel the phone for 10 or 12 days, but he did the other things within a day or two. (Tr. III, 563-64.) Petitioner acknowledged that he had talked to Otis Jeffrey Allen on September 17, 2000 about possibly hiring a private investigator to investigate whether Amy and Kelly may have been sexually assaulted by someone else. (Tr. III, 576.) He also told his neighbor, Jim Crane, that he was thinking about hiring an investigator to see if he could get records of Kelly being injured on a bike, in order to dispute the allegations against him. (Tr. III, 577.) The defense rested. (Tr. III, 579.)

At the conclusion of trial, on April 5, 2000, the jury found Petitioner guilty of all counts. (Tr. III, 665-66.) On June 11, 2000, Petitioner was sentenced to serve three terms of 20 to 40 years and one term of 6 to 15 years. (Sentencing Transcript, (S. Tr.), 13-14, docket #21.)

## B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on February 22, 2002, raised two issues: (1) the court erred in allowing into evidence hearsay testimony by Amy Howell and Pamela Maxon; and (2) the trial court deprived Petitioner of his Fifth Amendment rights by allowing the prosecutor to introduce into evidence Petitioner's silence when offered an opportunity to provide his side of the story to the police. (See Def.-Appellant's Br. on Appeal, docket #24.) By unpublished opinion issued on November 12,

2002, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (See 11/12/02 Mich. Ct. App. Opinion (MCOA Op.), docket #21.)

Petitioner filed an application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same two claims raised before and rejected by the Michigan Court of Appeals. Petitioner added a third issue, arguing that appellate counsel was ineffective in failing to raise the ineffectiveness of trial counsel in failing to investigate a prior injury to Kelly's vagina and in failing to call exculpatory witnesses.  By order entered May 30, 2003, the Michigan Supreme Court held the petition in abeyance pending the Court's resolution of the case of *People v. McNally* (Docket No. 120021).  (*See* 5/30/03 Mich. Ord., docket #25.)  On October 8, 2004, following resolution of the *McNally* case, the Court denied leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* Mich. Ord., docket #25.)

### C.      Post-conviction relief

Petitioner filed a motion for relief from judgment in the Lapeer County Circuit Court on September 19, 2005.  In his motion, Petitioner raised seven claims: (1) he was denied his rights under the Confrontation Clause by the admission of testimonial hearsay evidence; (2) he was denied due process by flagrant prosecutorial misconduct; (3) his sentence amounted to plain error and a violation of his Fifth, Sixth and Fourteenth Amendment rights because his maximum sentence was enhanced by judicial findings of facts Petitioner did not admit and were not found by the jury; (4) the trial court abused its discretion and denied Petitioner a fair trial by not excluding evidence of other bad acts, failing to properly instruct the jury, and permitting prosecutorial misconduct; (5) his trial attorney rendered ineffective assistance of counsel in failing to prepare a defense, to investigate, to object to prosecutorial misconduct, to secure expert witnesses, and to object to jury

instructions; (6) he was denied the effective assistance of appellate counsel in failing to raise the issues presented in the motion; and (7) he was deprived of due process by the cumulative effect of trial errors. The trial court denied the motion on November 8, 2005, addressing some issues on the merits and, on others, finding that Petitioner had failed to meet the requirements of MICH. CT. R. 6.508(D). (11/8/05 Cir. Ct. Ord., docket #26.) Petitioner sought leave to appeal the circuit court's order denying relief from judgment and, on July 26, 2006, the Michigan Court of Appeals denied leave to appeal for failure to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D). (2/13/06 MCOA Ord., docket #26.) Petitioner filed an application for leave to appeal to the Michigan Supreme Court. On February 7, 2007, the supreme court remanded the case for resentencing because the trial court had used the judicial sentencing guidelines rather than the legislative sentencing guidelines. The supreme court denied leave to appeal in all other respects because it was not persuaded that the remaining questions should be reviewed by the court. (2/7/07 Mich. Ord., docket #27.)

On February 19, 2007, Petitioner filed a motion to disqualify the trial judge on the grounds of judicial bias. The motion was denied, and Petitioner was resentenced on November 21, 2007 to three terms of 17 to 35 years for the CSC I convictions and one term of 6 to 15 years for the CSC II conviction. Petitioner appealed his new sentence to the Michigan Court of Appeals. In an unpublished opinion issued April 21, 2009, the court of appeals again reversed the sentence and remanded for resentencing, finding that the trial court had improperly scored Offense Variable 11, MICH. COMP. LAWS § 777.41, at 50 points. The Lapeer County Circuit Court resentenced Petitioner on November 30, 2009 to three terms of 11 to 24 years for the three first-degree CSC convictions

and 6 to 15 years for the second-degree CSC conviction. Petitioner did not appeal the November 30, 2009 sentence.

In the interim, on September 21, 2005, Petitioner filed an application for writ of habeas corpus in this Court. His petition presented both exhausted and unexhausted claims, and Petitioner sought a stay of his habeas proceedings in order to complete exhaustion of his then-unexhausted claims in the state courts. Upon review, the court denied Petitioner's motion seeking a stay and dismissed the petition without prejudice for lack of exhaustion, concluding that Petitioner had ample time remaining in his limitations period in which to file his petition after completion of his state-court proceedings.

Petitioner filed the instant application for writ of habeas corpus on or about April 10, 2007. The Court ordered Respondent to file an answer to the petition and any state-court materials required by Rule 5, RULES GOVERNING § 2254 CASES. Respondent filed the Rule 5 Materials on March 10, 2008. In the interim, on January 28, 2008, Petitioner sought a stay of these proceedings because certain unspecified claims remained pending in the state courts. The motion was denied on August 22, 2008 because Petitioner failed to identify the claims he intended to exhaust in state court. Petitioner renewed his motion on October 9, 2008, which was again denied because Petitioner failed to identify the claims he sought to exhaust. On June 29, 2009, Petitioner renewed his motion to stay yet again. On February 25, 2010, the Court held the motion in abeyance, directing Petitioner to either identify any claims he intended to raise on appeal or to file a motion to amend the petition, together with a proposed amended petition on the form. Petitioner moved to amend, and the amended petition was filed on July 21, 2010. Respondent filed an answer to the amended petition (docket #49), and Petitioner thereafter filed a reply (docket #58).

Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a

different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

I.      Prosecutorial Misconduct

In his first ground for habeas relief, Petitioner contends that the prosecutor engaged in flagrant and repeated misconduct that denied Petitioner a fair trial. Petitioner makes seven separate claims of prosecutorial misconduct. First, he alleges that the prosecutor improperly introduced hearsay testimony in violation of Petitioner's rights under the Confrontation Clause. Second, he complains that the prosecutor failed to produce the FIA staff members who were present with Officer Nael at the time Kelly made her statements, ostensibly depriving Petitioner of his right of confrontation. Third, Petitioner contends that various witnesses testified about conversations with Petitioner, Kelly or Amy, thereby violating Petitioner's right of confrontation. Fourth, Petitioner argues that the prosecutor violated his right to due process by introducing evidence of other uncharged and prior bad acts. Fifth, Petitioner asserts that the prosecutor impermissably vouched for the complainant's credibility. Sixth, Petitioner alleges that the prosecutor improperly introduced evidence of Petitioner's post-arrest silence. Seventh, he argues that the prosecutor's improper argument effectively shifted the burden of proof to Petitioner.

Prosecutorial misconduct results in a constitutional violation when the misconduct has "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). The Supreme Court has emphasized a series of factors to be evaluated in determining whether prosecutorial misconduct so infected the trial as to amount to a violation of due process: (1) whether the comments were isolated or pervasive, (2) whether they were deliberately or accidentally placed before the jury, (3) the degree

to which the remarks had a tendency to mislead and prejudice the defendant, (4) whether the prosecutor manipulated or misstated the evidence, (5) the strength of the overall proof establishing guilt, (6) whether the remarks were objected to by counsel and (7) whether a curative instruction was given by the court. *See Darden*, 477 U.S. at 182-83; *United States v. Young*, 470 U.S. 1, 12-13 (1985); *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

### A.     Alleged Confrontation-Clause Violations

Petitioner's first three claims of prosecutorial misconduct allege that the prosecutor impermissibly introduced evidence that violated Petitioner's right of confrontation.     The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him."  U.S. CONST., Am. VI.  The Supreme Court long has read this right as securing an adequate opportunity to cross-examine adverse witnesses. *United States v. Owens*, 484 U.S. 554, 557 (1988) (citing *Mattox v. United States*, 156 U.S. 237, 242-43 (1895) and *Douglas v. Alabama*, 380 U.S. 415, 418 (1965)).  In *Crawford v. Washington*, 541 U.S. 36 (2004), the Court held that testimonial out-of-court statements by witnesses are barred under the Confrontation Clause, unless witnesses are unavailable and defendants had a prior opportunity to cross-examine witnesses, regardless of whether such statements are deemed reliable by court.     *Id.* (abrogating *Ohio v. Roberts*, 448 U.S. 56 (1980)).   The Confrontation Clause, however, is only concerned with statements that are testimonial in nature. *Id.*; *see also Davis v. Washington*, 547 U.S. 813, 821 (2006) ("It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.").  Moreover, admission of an out-of-court statement does not offend the Confrontation

Clause if the declarant is present and testifying at trial. *Crawford*, 541 U.S. at 59 n.9 (citing *California v. Green*, 399 U.S. 149, 162 (1970)).

Here, Petitioner first argues that Amy Howell, Pamela Maxon, and Officer Nael should not have been permitted to testify about the statements made to them by Kelly Howell. Applying *Crawford*, the Lapeer County Circuit Court denied Petitioner's assertions on the merits.[1] The court specifically addressed only Kelly's statements to her sister, and found that they were not testimonial in nature.[2]

The state court's conclusion clearly constituted a reasonable application of *Crawford*. While the Supreme Court has not defined the full scope of statements that are testimonial, it described the following underlying definitions:

> The text of the Confrontation Clause reflects this focus [on testimonial hearsay]. It applies to "witnesses" against the accused – in other words, those who "bear testimony." 1 N. Webster, an american Dictionary of the English Language (1828). "Testimony," in turn, is typically "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Ibid.* An Accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.

*Crawford*, 541 U.S. at 51. The *Crawford* Court decided only that, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a

---

[1]Petitioner argued on direct appeal that various witness statements were improperly admitted under state hearsay rules, but he did not raise his confrontation claim until he filed his motion for relief from judgment.

[2]It is not entirely clear from the record before the Court whether Petitioner raised his Confrontation Clause claims concerning Amy Howell, Pamela Maxon and Officer Nael in his motion for relief from judgment in the trial court. To the extent that he failed to raise the claims in the state courts, he failed to exhaust his available state-court remedies. *See* 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) (requiring a petitioner to "fairly present" federal claims to all levels of the state courts). However, because no state remedies remain available to him, the failure to exhaust does not bar this Court's consideration of the issue, but Petitioner's claims are deemed procedurally defaulted. *See Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). However, the U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). Where, as here, it is simpler to address the question on the merits, the Court may skip the procedural default analysis. *Id.*

former trial; and to police interrogations." Since that time, the Supreme Court has recognized that even questioning by police may not always be testimonial in nature. *See Davis*, 547 U.S. at 828-29 (evidence produced by police questioning conducted for the purpose of assisting in an emergency is not testimonial). The Sixth Circuit has held that the proper inquiry is "whether the declarant intends to bear testimony against the accused. That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004), *quoted in United States v. Johnson*, 440 F.3d 832, 843 (2006).

Here, Kelly's statements to her sister clearly were not made for a testimonial purpose. Kelly was in distress and explaining to her sister the reasons for her distress. The state court's finding that the statements were not testimony clearly constituted a reasonable application of established Supreme Court precedent.

For the same reasons, Kelly's statements to her mother were nontestimonial in nature. In addition, Petitioner fails entirely to identify any statement, testimonial or otherwise, made by Kelly that was introduced by Officer Nael. Nael only testified to the circumstances of his interrogation of Kelly and what he did during the course of and as a result of that interrogation.

Moreover, as the state court held, regardless of whether any statement made by Kelly was testimonial, Kelly testified at trial and was subjected to extensive cross-examination. As a result, admission of her statements did not implicate the Confrontation Clause. *See Crawford*, 541 U.S. at 59 n.9 (the Confrontation Clause is satisfied if the declarant is present and testifies at trial). The state court's application of established Supreme Court precedent therefore was entirely reasonable on this alternate reasoning.

Petitioner's second and third claims of prosecutorial misconduct were not addressed by the state court. In his second claim, Petitioner complains that his rights under the Confrontation Clause were violated when the prosecutor failed to produce the two FIA employees who were present at the time of Kelly's interview with Nael. Petitioner's argument is misplaced. The right of confrontation is directed to ensuring that a defendant has an opportunity to cross-examine any witness giving testimony against him. *Green*, 399 U.S. at 157. Petitioner makes no argument that a statement by either FIA employee was used at trial. As a consequence, the Confrontation Clause was not implicated by their failure to testify.

In his third claim, Petitioner complains that the prosecutor committed misconduct and violated the Confrontation Clause by eliciting a variety of hearsay testimony, including testimony from both Amy Howell and Pamela Maxon about statements made to each other and from Officer Nael that FIA employee Shalonda Watkins made the appointment for medical examination.

Because both Amy Howell and Pamela Maxon testified and were subject to cross-examination at trial, the admission of any statement they made did not violate Petitioner's right to confrontation. *Crawford*, 541 U.S. at 59 n.9; *Green*, 399 U.S. at 162. Moreover, Officer Nael did not testify to any statement made by Shalonda Watkins. Instead, he testified to the fact that Watkins made the contact with Dr. Carter. While Nael possibly learned that fact by way of hearsay, his testimony was not necessarily based on hearsay. In addition, since no actual out-of-court statement was identified or used, the Confrontation Clause was not implicated by Nael's testimony.

Moreover, Confrontation Clause violations are subject to harmless error review. *See Hargrave v. McKee*, 248 F. App'x 718, 728 (6th Cir. 2007) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 681-84(1986)). On habeas review, a court must assess harmlessness under the standard

set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), regardless of whether the state appellate court recognized the error and reviewed it for harmlessness. *See Hargrave*, 248 F. App'x at 738 (citing *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007)); *see also Vasquez v. Jones*, 496 F.3d 564, 574-75 (6th Cir. 2007). The *Brecht* standard requires the Court to consider whether the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result. In determining whether the restriction was harmless, a court must consider a number of factors, "'includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" *Hargrave*, 248 F. App'x at 728 (quoting *Van Arsdall*, 475 U.S. at 684). Here, ample evidence demonstrates that an appointment was made for Kelly with Dr. Carter and that Dr. Carter examined Kelly on November 8, 2000. Even if Nael's testimony was based on hearsay, the admission of the evidence was entirely harmless.

### B. Introduction of Other Bad Acts

In his fourth claim of prosecutorial misconduct, Petitioner argues that the prosecutor committed misconduct by introducing evidence that Petitioner had engaged in other uncharged episodes of criminal sexual conduct with Kelly.

To the extent Petitioner intends to raise a claim under MICH. R. EVID. 404(b), his claim is not cognizable on habeas review. The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for]

it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

Petitioner cannot meet this difficult standard. The Supreme Court specifically has recognized that the admission of evidence of uncharged crimes ordinarily does not raise a constitutional issue. In *Lisenba v. California*, 314 U.S. 219 (1941), the Supreme Court held that the states are free under the Fourteenth Amendment to admit evidence of uncharged crimes in criminal cases when relevant to issues such as intent, design, or system. 314 U.S. at 227-28. *See also Estelle*, 502 U.S. 62 (holding that the admission of evidence of other bad acts does not violate due process).

Nor can Petitioner demonstrate that, on the facts of this case, the use of evidence of other bad acts was so extreme and prejudicial that it deprived Petitioner of fundamental fairness. *See Darden*, 477 U.S. at 181. The evidence about the course of Petitioner's sexual relationship with Kelly was relevant to Kelly's credibility regarding the charged offenses. The pattern helped explain why Kelly remembered the approximate dates of the three charged offenses, but not others, and made her behavior more understandable. The evidence of other episodes was limited and was neither sensational nor of a distinctive character.

Moreover, the trial court instructed the jury that the evidence was introduced for a limited purpose:

> You have heard evidence that was introduced to show that the Defendant has engaged in improper sexual conduct for which the Defendant is not on trial. If you believe this evidence you must be very careful to consider it for only a limited purpose; that is, to help you judge the believability of testimony regarding the acts for which the Defendant is now on trial. You must not consider this evidence for any other purpose. For example, you must not decide that it shows that the Defendant is a bad person or that the Defendant is likely to commit crimes. You must not convict the Defendant here because you think he is guilty of other bad conduct.

(Tr. III, 659-60.) The trial court's instruction expressly informed the jury that the evidence could not be used to prove propensity. Because the admission of other bad acts is itself not constitutionally barred, and because the trial court reasonably limited the evidence and provided an appropriate instruction, admission of the evidence was not fundamentally unfair. *Darden*, 477 U.S. at 181-82. As a result, the state-court decision to deny relief from judgment was "far from" an unreasonable determination of the facts in light of the evidence presented. *Clark v. O'Dea*, 257 F.3d 498, 502 (6th Cir. 2001); *see also Bugh*, 329 F.3d at 512.

## C.      Comments During Closing Argument

In his fifth and seventh objections to the prosecutor's conduct, Petitioner complains about various portions of the prosecutor's closing argument. First, he alleges that the prosecutor improperly vouched for the complainant and called Petitioner a liar. He also argues that the prosecutor's comments impermissibly shifted the burden of proof to Petitioner.

As previously discussed, in determining whether a prosecutor's comments constitute prosecutorial misconduct, "[t]he relevant question is whether [those] comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643). The habeas court must consider the extent to which the

claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, whether the claimed misconduct was deliberate or accidental, and the strength of the overall case. *Id.* In addition, the giving of cautionary instructions is relevant to determining whether fundamental fairness was denied. *Id.*

The defense theory at trial was that Kelly was motivated to lie about Petitioner because she did not like being made to do chores and she was angry at Petitioner because Amy was moving out. At closing, the prosecutor made the following comments about Petitioner's theory:

> [I]s that the kind of motivation that would cause someone as to allege they were having sex with their stepfather? Do you think that is legitimate motivation for that? This girl had to go to her mom and say, "Mom, I'm having sex with your husband." This girl had to go and submit to a physical examination where she lies on that table, she spreads her legs apart and has a doctor put a microscope into her vagina and document the way that vagina looks. Are those the kind of things a woman or young girl does because she's sick of the chores she has to do? Absolutely not. Absolutely not.

(Tr. III, 605.) Earlier, the prosecutor had summarized the evidence, emphasizing that much of the evidence was uncontested; the only real question was whether Kelly was lying. The prosecutor argued that, if the jury looked at all the facts, it would conclude that Kelly was not lying, but Petitioner was lying. The prosecutor asked the jury to use their collective common sense about whom to believe.

The Lapeer County Circuit Court rejected Petitioner's claim. The court held that "the prosecution's comment was not misconduct but a proper remark based on the evidence presented." (11/8/05 Cir. Ct. Ord., docket #26.) The state court's determination clearly was a reasonable application of Supreme Court precedent. "Prosecutors can argue the record, highlight any inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence." *Cristini v. McKee*, 526 F.3d. 888, 901 (6th Cir. 2008). They may not, however, offer

their own opinions as to the credibility of witnesses or the guilt of a defendant and may not discuss any purported facts not in evidence. *Id.* (citing *Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005). As the Supreme Court held in *Young*, 470 U.S. at 18-19, such conduct bears two risks.[3]  First, such comments may suggest that the prosecutor is aware of facts not presented to the jury that support the evidence. *Id.* at 18.  Second, the prosecutor's opinion "carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Id.* at 18-19.  However, when the prosecutor makes such a statement in the context of a lengthy discussion of the evidence, the risks identified by the Supreme Court are not present. *Cristini*, 526 F.3d at 902.

Here, the prosecutor's statement about Kelly's credibility followed an extensive discussion of the facts of the case.  The prosecutor did not refer to facts not in evidence, share his personal beliefs, or suggest that he had additional information not before the jury.  Instead, his comments were directed to the reasonableness of Petitioner's theory about why Kelly was motivated to lie, using evidence introduced at trial and asking the jury to make reasonable inferences from those facts.  Further, to the extent that the prosecutor called Petitioner a liar, the comment again came as a conclusion following a discussion of the evidence presented.  *See Cristini*, 526 F.3d. at 901 (holding that where a prosecutor's statement that a witness is lying is made in the context of a discussion of the evidence, the argument is not improper) (distinguishing *Hodge*, 426 F.3d at 378).

Moreover, even if the arguments had some potential to be prejudicial, that potential was only slight.  The evidence against Petitioner was substantial.  Further, the trial court instructed

---

[3]I note that *Young*, 470 U.S. 1, was not decided on habeas review and was not expressly based on constitutional principles.  Nevertheless, the Sixth Circuit applies the case to habeas determinations. *See, e.g., Cristini*, 526 F.3d at 901; *Hodge*, 426 F.3d at 378-79.

the jury that the attorneys' statements and arguments were not evidence. (Tr. III, 651.) For all these reasons, the prosecutor's remarks did not deprive Petitioner of a fundamentally fair trial.

In his seventh claim of prosecutorial misconduct, Petitioner objects to the following statement during closing argument:

> In assessing whether or not these acts occurred, the testimony of the victim, in and of itself is enough to convict the Defendant of these charges. I submit to you what you saw in Kelly Howell and the way she testified is enough to convince you beyond a reasonable doubt that these crimes did in fact occur.

(Tr. III, 585.) Later in his closing argument, the prosecutor repeated the substance of this statement:

> I submit to you that [Kelly's] testimony, in and of itself, is enough to convict this man of having sex with his stepdaughter. In and of itself. The jury instruction talks right about that. The jury instructions says if you believe her testimony beyond a reasonable doubt, it's done.

(Tr. III, 594.) Petitioner contends that the prosecutor's statements improperly shifted the burden of proof to Petitioner.

The circuit court concluded that the prosecutor's remarks were proper and correctly stated the law. It reasoned that the jury instructions given to the jury provided that the jury could believe one witness against many and that it was not necessary that there be evidence other than the testimony of the complaining witness if that testimony proved guilt beyond a reasonable doubt. (11/8/05 Cir. Ct. Op. at 4, docket #26.)

Again, the circuit court's decision was patently reasonable. The prosecutor's comments were not improper. They accurately summarized the instructions, and they properly advised the jury that Kelly's testimony alone, if believed beyond a reasonable doubt, was sufficient for the jury to find Petitioner guilty.

Petitioner next argues that the prosecutor committed misconduct by failing to investigate Kelly's 1994 bicycle accident, which Petitioner contends would have provided exculpatory evidence by demonstrating another reason for any damage to Kelly's hymen. Petitioner argues that the failure to investigate violated the Supreme Court's holding in *Brady v. Maryland*, 373 U.S. 83 (1963). Under *Brady*, "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.

The circuit court, citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988), concluded that, while the Due Process Clause requires the government to disclose exculpatory evidence, it does not require the government to test particular evidence. (11/8/05 Cir. Ct. Op. at 4, docket #26.) That determination was entirely reasonable. In *Youngblood*, 488 U.S. at 59, the Supreme Court rejected the proposition "that the Due Process Clause is violated when the police fail to use a particular investigatory tool." *Id.* Petitioner was free to argue or produce evidence of the bicycle accident as an possible explanation the injuries testified to by Dr. Carter. But the government had no duty to discover and investigate the accident. *Id.* The circuit court's ruling constituted a reasonable application of established Supreme Court precedent.

### D. Use of Petitioner's Silence

In his sixth claim of prosecutorial misconduct, Petitioner argues that the prosecutor violated his Fifth Amendment rights by eliciting testimony about his post-arrest silence. Specifically, Petitioner refers to the following exchange during direct examination of Trooper Nael:

> Q      Did you make any – after interviewed [sic] Amy Howell, Kelly Howell and Pam Maxon, did you try to interview anyone else as relates to this investigation?

A    I tried to interview Mr. Maxon.

Q    Were you successful in your attempt?

A    No, I was not.

Q    At any point in time did you have any discussion with Mr. Maxon?

A    I called Mr. Maxon on Monday.  I believe that would have been September 18th.  I talked to him in the morning at approximately nine or 10:00.  I was able to finally talk with him [on] the phone.  I indicated to him that I wanted to talk to him.  He was unaware of why I wanted to talk to him.

Q    Did you specifically ask him if he knew why you wanted to talk to him?

A    When I called, I told him I needed to talk to him and he asked me why.  I eventually told him there had been a complaint made against him and I wanted to get his side of the story.  During the conversation there was a point in time where he seemed he was unaware of why I wanted to talk to him and then he told me he would be at the State Police Post by 1:00 that day.

Q    Did you talk to him at 1:00?

A    No.

        MR. HOFFMAN: I'm going to object to this line of questioning.  I think he has a Fifth Amendment right not to incriminate himself and I don't think that he's required by any state law to talk to the officer and I think it's improper to go into this.

        MR. TURKELSON:  Your Honor, I acknowledge that he has a Fifth Amendment right not to talk to the office[r] and I have no problem with that.  At the same time I think the jury has a right to know that this officer did make every effort to conduct a thorough and complete investigation.

        THE COURT:  If I understand the testimony, an appointment was made for 1:00 p.m.?

        MR. TURKELSON:  Exactly.

        THE COURT:  Ask him whether Mr. Maxon was there and then let's move on.

> Q (BY MR. TURKELSON) You indicated an appointment was made for 1:00
> p.m. Did Jeff Maxon show up at the State Police Post at 1:00 p.m.?
>
> A No, he did not.

(Tr. II, 463-65.) Thereafter, the prosecutor referred to the testimony in closing argument:

> Trooper Nael did everything he could do. He even talked with the Defendant on the
> phone and set up an appointment. He did everything he could do to give Jeff Maxon
> an opportunity to talk to him. Trooper Nael did his job.

(Tr. III, 602.)

Petitioner's claim was raised on direct appeal. The court of appeals rejected

Petitioner's argument as follows:

> Next, defendant argues that his Fifth Amendment right to remain silent was
> violated when the prosecution introduced evidence, and referred to that evidence in
> closing argument, that defendant did not appear at a scheduled appointment that he
> had made with the investigating police officer to discuss the allegations. We
> disagree.
>
> In a criminal trial, the use of a defendant's silence as evidence is limited by
> the constitutional privilege against self-incrimination and the right to due process.
> See *People v Dennis*, 464 Mich 567, 573-574; 628 NW2d 502 (2001). However,
> silence that does not occur during a custodial interrogation or in reliance on *Miranda*
> warnings is not constitutionally protected and evidence of the same may be admitted
> as substantive evidence. See *People v Schollarert*, 194 Mich App 158, 164, 166-167;
> 486 NW2d 312 (1992). Accordingly, here, the brief reference to defendant's failure
> to keep a scheduled appointment with the police investigator, for the purpose of
> rebutting the inference that the investigation was not thorough, did not violate
> defendant's constitutional rights. Defendant's reliance on *People v Bobo*, 390 Mich
> 355; 212 NW2d 190 (1973), a case involving a defendant's silence *at the time of
> arrest*, is misplaced. Therefore, the trial court properly admitted the contested
> evidence.

(11/12/02 MCOA Op. at 3, docket #24 (emphasis in original, footnote omitted.)

In *Doyle v. Ohio*, 426 U.S. 610, 619 (1976), the Supreme Court held "that the use for

impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda*

warnings, violated the Due Process Clause of the Fourteenth Amendment." The theory underlying

*Doyle* is that, while *Miranda* warnings contain no express assurance that silence will carry no penalty, "such assurance is implicit to any person who receives the warnings." *Id.* at 618. On this reasoning, the Court concluded that it would be fundamentally unfair first to induce a defendant to remain silent through *Miranda* warnings and then to penalize the defendant who relies on those warnings by allowing the defendant's silence to be used to impeach an exculpatory explanation offered at trial. *Id.* However, *Doyle* applies only in the context of post-*Miranda* silence. In cases following *Doyle*, the Supreme Court has held that the Fifth and Fourteenth Amendments permit a defendant to be impeached with his prearrest pre-*Miranda* silence, *Jenkins v. Anderson*, 447 U.S. 231, 238 (1980), or postarrest pre-*Miranda* silence, *Fletcher v. Weir*, 455 U.S. 603, 607 (1982), if he later takes the stand during his criminal trial.

In this case, however, Petitioner was not impeached with his failure to speak to Trooper Nael. Instead, Trooper Nael testified to Petitioner's failure to appear for questioning, which Petitioner asserts could have been used by the jury as substantive evidence of his guilt.[4] The Sixth Circuit has held that the use of even pre-arrest silence as substantive evidence is barred by the Fifth Amendment. *See Combs v. Coyle*, 205 F.3d 269, 283 (6th Cir. 2000) (granting habeas relief); *see also Hall v. Vasbinder*, 563 F.3d 222, 232 (6th Cir. 2009) (recognizing continuing viability of *Combs*). However, "'[t]he constitutionality of using a defendant's pre-*Miranda* silence as substantive evidence of guilt [has] not been addressed by the Supreme Court.'" *Hall*, 563 F.3d at 232 (quoting *Jones v. Trombley*, 307 F. App'x 931, 933 (6th Cir. 2009)). Indeed, the Sixth Circuit's decision in *Combs* recognized the existence of a circuit court split on the issue. *Combs*, 205 F.3d at 282-83 (collecting cases). Moreover, the *Combs* decision was issued under a pre-AEDPA, *de*

---

[4]Taken in context, the testimony appears not to have been intended as substantive evidence, but only to show that Trooper Nael had conducted a thorough investigation.

*novo* standard of review. *See Hall*, 563 F.3d at 232 (citing *Combs*, 205 F.3d at 283). Because the *Combs* decision does not rest on clearly established Supreme Court precedent and did not apply the proper standard of review, it is not controlling in this case. *See Hall*, 563 F.3d at 232 (citing *Hereford v. Warren*, 536 F.3d 523, 532 (6th Cir. 2008)); *Jones*, 307 F. App'x at 934 n.1).

As previously discussed, on habeas review, this Court is limited to applying only the clearly established holdings of the United States Supreme Court. *See* 28 U.S.C. 2254(d); *Williams*, 529 U.S. at 412; *Bailey*, 271 F.3d at 655. Because the Supreme Court has not yet decided the issue, the state court's decision that Petitioner's pre-arrest silence could be used as substantive evidence of guilt is neither contrary to nor an unreasonable application of established Supreme Court precedent.

II.      Trial Court Error

In his second ground for habeas relief, Petitioner contends that the trial court abused its discretion and denied him a fair trial in four ways. First, he argues that the trial court improperly allowed the admission of uncharged bad acts contrary to MICH. R. EVID. 404(b) and MICH. R. EVID. 608. Second, he asserts that the trial court failed to properly instruct the jury. Third, he contends that the trial court improperly allowed the prosecution to introduce inadmissible testimonial statements. Fourth, Petitioner contends that the trial court showed actual bias and deprived him of a fair trial.

As previously discussed, to the extent Petitioner bases his claim on state law, he fails to raise an issue cognizable on habeas review. *See Estelle*, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to re-examine state-court determinations on state-law questions").

In addition, Petitioner's first and third claims of trial-court error have previously been rejected.  In addressing Petitioner's contentions under his prosecutorial misconduct claim, I concluded that the admission of the uncharged bad acts and the admission of the hearsay statements of Kelly Howell, Amy Howell and Pam Maxon failed to raise claims of constitutional dimension.  As a consequence, the circuit court did not violate Petitioner's constitutional rights by admitting either type of evidence.

In his second claim, Petitioner argues that the trial court failed to properly instruct the jury, leading to a compromise verdict.  Petitioner's argument is less than fully clear.  He appears to first suggest that insufficient evidence supported the jury's verdicts.  A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*  Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993).  Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

Petitioner fails to apply the *Jackson* standard, instead interpreting the facts in the light most favorable to the defense.  As is apparent from the earlier description of the record evidence, Kelly Howell's own testimony provided ample evidence to support all charges, including the CSC

II charge. As a result, the trial court committed no error in denying a directed verdict to Petitioner on that charge. Further, no evidence suggests that the jury simply reached a compromise verdict on any charge.

Moreover, to the extent that Petitioner argues that the trial court failed to properly instruct the jury, he fails to raise a claim of constitutional magnitude. Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review. Instead, Petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). *See also Estelle*, 502 U.S. at 75 (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000) (same). If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law. *Id.*

Petitioner wholly fails to meet this difficult standard. Indeed, he fails to articulate his claim with any specificity. He appears to suggest that the trial court confused the jury when it instructed on the various degrees of CSC. Upon review, however, I conclude that the trial court separately instructed the jury on the elements of each charged count of CSC. The court informed the jury that the prosecutor contended that Petitioner had committed all four charges and that it was the jury's duty to determine Petitioner's guilt on each separate charge. No error in the court's instruction is apparent on the record, much less one that so infected the trial with unfairness as to amount to a due process violation.

In his final argument in his second habeas ground, Petitioner suggests that the trial court demonstrated clear bias at trial, at sentencing and during post-conviction proceedings. With

respect to the trial, Petitioner again raises arguments about the admission of evidence with which he disagrees – arguments that I previously have rejected.  Petitioner also complains that, at sentencing, the trial court demonstrated bias by calling Petitioner a "predator" from whom society needed to be protected.  In the post-conviction context, Petitioner claims that the trial court's bias was demonstrated when "defied the Michigan Supreme Court's Order" by imposing the same sentence after remand.  (Second Am. Pet. at 32, docket #45 at 38.)

Due process requires that a judge be unbiased.  *See In re Murchison*, 349 U.S. 133, 136 (1955), cited in *Railey v. Webb*, 540 F.3d 393, 399-400 (6th Cir. 2008).  At a minimum, fairness requires an absence of actual bias in the trial of cases.  *Murchison*, 349 U.S. at 136.  In addition, a judge can and should be disqualified for a likelihood of bias or even an appearance of bias.  *Railey*, 540 F.3d at 399-400 (citing *Ungar v. Sarafite*, 376 U.S. 575, 588 (1964)); *accord Anderson v. Sheppard*, 856 F.2d 741, 746 (6th Cir. 1988) (opining that due process "require[s] not only an absence of actual bias, but an absence of even the appearance of judicial bias").

However, it is equally clear that judicial disqualification based on a likelihood or an appearance of bias is not always of constitutional significance; indeed, "most matters relating to judicial disqualification d[o] not rise to a constitutional level."  *Fed. Trade Comm'n v. Cement Inst.*, 333 U.S. 683 (1948) (citing *Tumey v. Ohio*, 273 U.S. 510, 523 (1927)); *see also Bracy v. Gramley*, 520 U.S. 899, 904 (1997).  The Supreme Court has held in only two types of cases that something less than actual bias violates constitutional due process: (1) cases that the judge "has a direct, personal, substantial pecuniary interest in reaching a [particular] conclusion," *Tumey*, 273 U.S. at 523 (subsequently expanded to include even indirect pecuniary interest); and (2) certain contempt cases, for instance, those in which the "judge becomes personally embroiled with the contemnor,"

*Murchison*, 349 U.S. at 141 (subsequently clarified to involve cases in which the judge suffers a severe personal insult or attack from the contemnor). *See also Railey*, 540 F.3d at 400. The Court also has recognized four types of cases that, although they present prudent grounds for disqualification, generally do not rise to a constitutional level – matters of kinship, personal bias, state policy, and remoteness of interest. *Railey*, 540 F.3d at 400 (citing *Tumey*, 273 U.S. 523); *accord Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 820 (1986).

Petitioner has not demonstrated constitutional bias – either actual bias, the likelihood of bias, or the appearance of bias. He does not alleged that the trial judge had a financial interest in the outcome or that the proceedings involved contempt of court. Indeed, Petitioner cannot demonstrate any appearance of bias, constitutional or otherwise. The trial court's reference to Petitioner as a "predator" was based on the jury's findings that Petitioner was guilty of four CSC offenses against his thirteen-year-old step-daughter. Such a statement does not demonstrate bias. It is a conclusion based on the evidence at trial and the jury's findings of guilt. For all these reasons, the state court decision was a reasonable application of established Supreme Court precedent.

III.    Sentencing Issues

Petitioner argues that he was sentenced in violation of the Fifth, Sixth and Fourteenth Amendments in four interrelated ways. First, he argues that the trial court improperly relied on a finding that Petitioner was predator in order to justify its departure from the sentencing guidelines. Second, he contends that a jury, not a judge, must make a determination of every factor relevant to guilt or punishment. Third he argues that Michigan's sentencing scheme unconstitutionally permits judicial factfinding. Fourth, he asserts that the state scheme operates to allow punishment based on factors never submitted to a jury or proved beyond a reasonable doubt.

Petitioner's first sentencing argument does not present a federal constitutional claim. There is no constitutional right to individualized sentencing in non-capital cases. *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991); *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995); *see also Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978) (in a case holding that mitigating factors must be fully considered in death penalty cases, the Court "recognize[d] that, in noncapital cases, the established practice of individualized sentences rests not on constitutional commands, but on public policy enacted into statutes."). Since Petitioner has no federal right to an individualized sentence, this ground presents an issue of state law only. *See Hutto v. Davis*, 454 U.S. 370, 373-74 (1982) (federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature). Petitioner has not alleged grounds for the Court to conclude that this is one of those rare instances where an alleged state-law sentencing error was so egregious that it led to a fundamentally unfair outcome. *See Koras v. Robinson,* 123 F. App'x 207, 213 (6th Cir. Feb. 15, 2005) (citing *Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003)).

The remaining sentencing arguments involve a single claim. Petitioner contends that the trial court judge violated his Sixth Amendment right to a trial by jury by using, to enhance his sentence, facts that had not been admitted by Petitioner or found by a jury beyond a reasonable doubt. Petitioner bases his argument on the United States Supreme Court holding in *Blakely v. Washington*, 542 U.S. 296 (2004). *Blakely* concerned the State of Washington's determinate sentencing system, which allowed a trial judge to elevate the maximum sentence permitted by law on the basis of facts not found by the jury but by the judge. Applying the Washington mandatory sentencing guidelines, the trial judge found facts that increased the maximum sentence faced by the defendant. The Supreme Court found that this scheme offended the Sixth Amendment, because any

fact that increases or enhances a penalty for the crime beyond the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt. *Blakely,* 542 U.S. at 301 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

      Unlike the State of Washington's determinate sentencing system, the State of Michigan has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum term. The maximum sentence is not determined by the trial judge, but is set by law. *See People v. Drohan,* 715 N.W.2d 778, 789-91 (Mich. 2006) (citing Mich. Comp. Laws § 769.8). Only the minimum sentence is based on the applicable sentencing guideline range. *Id.*; *and see People v. Babcock*, 666 N.W.2d 231, 236 n.7 (Mich. 2003) (citing Mich. Comp. Laws § 769.34(2)). The Sixth Circuit authoritatively has held that the Michigan indeterminate sentencing system does not run afoul of *Blakely*. *See Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. Nov. 10, 2009) (affirming district court's dismissal of prisoner's claim under *Blakely v. Washington* because it does not apply to Michigan's indeterminate sentencing scheme); *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007). Therefore, the state court's determination of Petitioner's claim was not contrary to federal law clearly established by the United States Supreme Court or an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

IV.    Ineffective Assistance of Trial Counsel

In his fourth habeas ground, Petitioner argues that he was deprived of the effective assistance of counsel.  He asserts that counsel (1) failed to investigate matters mitigating to the case; (2) failed to prepare a defense; (3) failed to seek expert assistance; (4) failed to object to the prosecutor's flagrant misconduct; and (5) failed to object to the trial court's improper rulings, the jury instructions, the reasons for sentencing, and the improper scoring of the sentencing guidelines.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief unless counsel's error had a reasonable probability of affecting the judgment.  *Id.* at 691.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The prejudice prong "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). "When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697. Similarly, where counsel's performance did not fall below an objective standard of reasonableness, the court need not reach the question of prejudice. *See United States v. Foreman*, 323 F.3d 498, 504 (6th Cir. 2003).

Petitioner argues, however, that his claims fall under *United States v. Cronic*, 466 U.S. 648 (1984). In *Cronic*, the Supreme Court held that the denial of counsel during a critical stage of the proceeding amounts to a per se denial of the effective assistance of counsel. *See United States v. Cronic*, 466 U.S. 648 (1984). In *Bell*, 535 U.S. 685, the Supreme Court defined the differences between claims governed by *Strickland* and claims governed by *Cronic*. If a claim is governed by *Strickland*, a defendant typically must demonstrate that specific errors made by trial counsel affected the ability of the defendant to receive a fair trial. If a claim is governed by *Cronic*, however, the defendant need not demonstrate any prejudice resulting from the lack of effective counsel. *See Mitchell v. Mason*, 325 F.3d 732, 741 (6th Cir. 2003) (citing *Bell*, 535 U.S. at 695). Three types of cases warrant the presumption of prejudice: (1) when the accused is denied the presence of counsel at a critical stage; (2) when counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) when counsel is placed in circumstances in which

competent counsel very likely could not render assistance. *Mitchell*, 325 F.3d at 742 (quoting *Bell*, 535 U.S. at 695).

Petitioner contends that he was constructively denied counsel by the complete failure of counsel to perform pretrial investigation. Petitioner's contention is without merit.

In *Mitchell*, 325 F.3d 732, the Sixth Circuit granted habeas corpus relief to a Michigan prisoner whose counsel was suspended from practice for the entire month preceding trial, had never interviewed Petitioner before trial, had failed to respond to Petitioner's letters, had failed to respond to Petitioner's mother's letters, and had failed to speak with or call witnesses to the events underlying the charge of first-degree murder. The *Mitchell* court concluded that the combination of circumstances resulted in a complete denial of counsel during the critical pretrial investigation phase. *Mitchell*, 325 F.3d at 741.

The Sixth Circuit's holding holding in *Mitchell* was a narrow one, limited strictly to its facts. "[W]e have applied *Cronic* only where the constructive denial of counsel and the associated collapse of the adversarial system is imminently clear." *Moss v. Hofbauer*, 286 F.3d 851, 860 (6th Cir. 2002) (holding that counsel's failure to cross-examine key state witnesses was not prejudicial per se). "'[C]onstructive denial of counsel is limited to situations involving constitutional error of the first magnitude which cannot be cured even if no prejudice is shown.'" *Ivory v. Jackson*, 509 F.3d 284, 295 (6th Cir. 2007) (quoting *Moss*, 286 F.3d at 860). Examples of performance giving rise to per se prejudice that are cited in *Moss* include counsel sleeping through critical proceedings, *Burdine v. Johnson*, 262 F.3d 336, 349 (5th Cir. 2001); expressing contempt and "unmistakable personal antagonism" toward the client in the presence of the jury, *Rickman v.*

*Bell*, 131 F.3d 1150, 1156-60 (6th Cir. 1997); and affirmatively declining to present a defense because of an unsound trial strategy, *Martin v. Rose*, 744 F.2d 1245, 1250-51 (6th Cir. 1984).

Here, Petitioner makes only discrete and limited complaints about counsel's failure to investigate and present evidence. He complains that counsel did not obtain Kelly's medical and psychological records for use at trial. He also asserts that interviews with the FIA employees who interviewed Kelly would have revealed influence undisclosed by Trooper Nael. And he argues that defense counsel should have obtained an expert, though he does not indicate what the expert would be expected to say. Even assuming that counsel failed to perform the tasks about which Petitioner complains, Petitioner provides no evidence that those tasks would have generated information helpful to Petitioner. In addition, none of these matters was central to refuting the principle evidence of Petitioner's guilt – Kelly's trial testimony. Petitioner does not contend that his attorney failed to consult with him. Moreover, counsel clearly was prepared for trial, had a sound and coherent trial strategy, and conducted substantial and cogent cross-examination. Contrary to Petitioner's argument, such allegations fall far short of the constructive denial of counsel that the Sixth Circuit found warranted *Cronic* review in *Mitchell*, 325 F.3d at 742. *See also Ivory*, 509 F.3d at 295 (recognizing that *Mitchell* rested on the fact that the defendant was denied the *presence* of counsel during the critical stages because counsel was suspended from practice during the entire month preceding trial). As a consequence, Petitioner is not entitled to a presumption of prejudice under *Cronic*, and the Court will apply the *Strickland* analysis.

With respect to Petitioner's claim that his attorney failed to obtain medical and psychological records, Petitioner fails to provide any evidence about what those records would have proved. Pam Maxon acknowledged that Kelly had been seeing a therapist since she revealed the

abuse, but nothing in the record indicates that psychiatric records would provide any information relevant to the question of Petitioner's guilt. Further, Petitioner suggests that counsel should have obtained the medical records regarding Kelly's bicycle accident in 1994, but Petitioner provides no basis for assuming those records would have resulted in material information relevant to the jury's decision. Petitioner does no more than suggest that a bicycle accident five years before the alleged sexual conduct may possibly have caused vaginal injuries. Although Petitioner hypothesizes that a bicycle injury might provide an alternative explanation for the injuries to which Dr. Carter testified, Dr. Carter expressly rejected that possibility at the preliminary examination. Dr. Carter testified that, in order for such an injury to have occurred accidentally, the victim would have had to fall on a stake pointing straight up. (12/1/00 Tr. Prelim. Exam, 45, docket #23.) Further, evidence of an injury from a bicycle accident would not undermine Kelly's detailed testimony about the sexual abuse.

In the absence of evidence that medical records or expert testimony would provide any relevant information, Petitioner fails to undermine the strong presumption that counsel's decision was strategic. *Strickland*, 466 U.S. at 689. Moreover, Petitioner also fails to show the necessary prejudice. Given the remainder of the testimony in the case and the absence of any evidentiary support for his assumptions, Petitioner cannot show either that the trial result was unreliable or that the proceeding was fundamentally unfair.

Further, to the extent that Petitioner argues that defense counsel was ineffective for failing to object to the prosecutor's misconduct or the trial court's evidentiary rulings and jury instructions, I previously have found that Petitioner failed to prove either misconduct or trial court error. Defense counsel therefore cannot have been ineffective for failing to object to either.

Petitioner's remaining two arguments are entirely conclusory and unexplained. He claims that defense counsel was ineffective by failing to object to the scoring of offense variables, but he does not identify any offense variable that should have been scored differently. He also alleges that counsel was not familiar with the law applicable to Petitioner's charges. Again, however, he fails to specify what law counsel ostensibly did not know. Petitioner therefore fails entirely to undermine the presumption that counsel's performance was within the range of reasonable professional assistance. Moreover, even if trial counsel erred in the initial scoring of Petitioner's sentence, that sentence was vacated twice, and Petitioner successfully obtained a reduction in his sentence on the second remand. Petitioner fails to explain how any error by counsel at the original sentencing continues to have a prejudicial impact on his corrected sentence. As a consequence, Petitioner fails to demonstrate both the performance and the prejudice prongs of *Strickland.*

V.    Ineffective Assistance of Appellate Counsel

Petitioner claims that his appellate attorney rendered ineffective assistance by failing to raise on direct appeal the other issues identified in Petitioner's habeas petition. He also claims that appellate counsel failed to follow Petitioner's specific instructions with respect to the appeal, thereby depriving him of effective assistance of counsel. In addition, he claims that appellate counsel was ineffective when he failed to investigate the 1994 bicycle accident. Finally, Petitioner contends that appellate counsel did not keep him adequately informed about his appeal.

An appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."

*Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).

To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.* at 289.

In its opinion on Petitioner's motion for relief from judgment, the trial court considered and rejected his claim of ineffective assistance of appellate counsel. The court noted that appellate counsel raised two issues: (1) the admission of the victim's excited utterance; and (2) the violation of Petitioner's Fifth Amendment rights by the admission of evidence of Petitioner's failure to appear at a scheduled interview with Trooper Nael. While those issues were not ultimately successful, the court found that their selection constituted a reasonable strategic choice.

The state court's determination constituted a reasonable application of established Supreme Court precedent. The claims raised by Petitioner in his motion for relief from judgment were not clearly stronger than the claims raised on direct appeal. *Strickland*, 528 U.S. at 289. Further, although Petitioner ultimately was successful in obtaining resentencing, those claims do not support habeas relief. After Petitioner was resentenced the second time, receiving substantially reduced sentences, he did not appeal. And Petitioner no longer seeks habeas relief in the form of resentencing. Consequently, the fact that his sentencing issues may have been stronger than the claims on appeal has resulted in no ongoing prejudice to Petitioner.

<u>Recommended Disposition</u>

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Date: October 25, 2010                     /s/ Ellen S. Carmody
                                                         ELLEN S. CARMODY
                                                         United States Magistrate Judge

## **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).